## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| KAREN DEVAUGHN, | ) | CASE NO. 1:13-CV-999 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | NANCY A. VECCHIARELLI |
| | ) | |
| SEIU DISTRICT 1199 WV/KY/OH, | ) | |
| | ) | |
| Defendant. | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| | ) | (Doc. Nos. 41, 47) |

This case is before the undersigned United States Magistrate Judge upon the

consent of the parties.  Before the Court are the motions: (1) for summary judgment

(doc. no. 41); and (2) to strike Plaintiff's opposition to the motion for summary judgment

(doc. no. 47), filed by Defendant, SEIU District 1199 ("Defendant" or "SEIU").  For the

reasons set forth below, Defendant's motion for summary judgment is GRANTED and

the motion to strike is DENIED as moot.

## I.    BACKGROUND

### A.    Factual Background

The following facts are not in dispute.

SEIU is a union that represents health care and public sector workers in Ohio,

West Virginia and Kentucky.  (Declaration of Josh Norris ("Norris Decl.") at ¶ 1, Doc. No.

41-5.)  In August 2011, SEIU hired DeVaughn as an administrative organizer in its

public sector division, which covers public employers such as state and local

governments, libraries, schools and county boards.  (*Id.* at ¶¶ 3, 5.)[1]  An administrative

organizer is "assigned to specific facilities within [SEIU] and is responsible for the labor

management relationship at the facilities assigned.  This includes, but is not limited to,

negotiating collective bargaining agreements, filing grievances, mediating and arbitrating

grievances, building relationships with members, and fostering strong member-leaders."

(Frank Decl. at ¶ 8.)  Administrative organizers also conduct internal elections.  (Norris

Decl. at ¶ 5.)  DeVaughn served as the administrative organizer for the Avon Lake

Public Library, Catholic Charities, Cuyahoga Community College ("Tri-C"), the Lorain

Public Library, the Portage Public Library, the Willoughby Eastlake Public Library, the

Wood County Health Department, and the Youngstown Public Library.  (*Id.* at ¶ 7.)

During the relevant time, Josh Norris was the director of SEIU's public sector division

and, thus, was DeVaughn's supervisor.  (Norris. Decl. at ¶¶ 2, 4.)

    Administrative organizers work independently, and spend a lot of time traveling

to the facilities to which they are assigned.  (Norris. Decl. at ¶ 6.)  During the relevant

time, SEIU required organizers to report the mileage they incurred while traveling for

---

[1] The parties dispute the date on which DeVaughn became a non-probationary employee of SEIU.  DeVaughn worked for SEIU – which requires its permanent employees to complete a one-year probationary period – during May and June 2011 as a temporary project canvasser.  (Declaration of Sara Frank ("Frank Decl.") at ¶¶ 3-5, Doc. No. 41-2.)  She contends that her hiring as an administrative organizer in August 2011 was a continuation of that employment, such that, at the time of her termination, she had completed her one-year probationary period with SEIU.  (Deposition of Karen DeVaughn ("DeVaughn Dep.") at 14:8-12, Doc. No. 42-1.)  Defendant contends that DeVaughn "stopped working" for SEIU in early July 2011, when the temporary canvassing project ended and, thus, there was a gap in time between the end of her employment as a canvasser and her August 2011 hiring as an administrative organizer.  (Frank Decl. at ¶ 6.)  This issue, however, is most relevant to Plaintiff's claim that SEIU breached the collective bargaining agreement between the union and its staff.  This Court dismissed that claim in March 2014.  (Doc. No. 36.)

work.  (Frank Decl. at Ex. B, Staff Mileage Policy, Doc. No. 41-2.)  To report mileage, an SEIU staff member logged into one of two web sites and inputted the amount of mileage he or she incurred during that month.  (Declaration of Connie Figgins ("Figgins Decl.") at ¶ 4, Doc. No. 41-1.)  SEIU's mileage policy required a staff member to report mileage incurred during the first 15 days of a month by the twentieth day of that month, and to report mileage incurred during the remainder of the month by the fifth day of the following month.  (Id.)  Additionally, SEIU required its administrative organizers to maintain an electronic calendar reflecting their whereabouts, which could be accessed by Norris.  (Norris Decl. at ¶ 6.)  Defendant required administrative organizers to update the calendar to accurately reflect their schedule, and to upload changes to the calendar using Defendant's virtual private network ("VPN").  (Id.)  Because administrative organizers worked in the field and, thus, were difficult to supervise, Norris "greatly rel[ied] on the shared calendar," as well as on "reported mileage [to] check mileage claimed against the share[d] calendar for added confirmation that an administrative organizer [was] doing his or her job duties."  (Id.)

In June 2012, SEIU terminated DeVaughn.  (Norris Decl. at ¶ 8.)  Norris described the reasons for her termination as follows:

> I was one of the individuals responsible for making the decision to terminate DeVaughn on June 13, 2012 due to several performance issues, including but not limited to: her inability to accurately report her mileage or record her whereabouts on a shareable calendar either by using the system at one of the Defendant's offices or the Union's VPN . . . which can be accessed anywhere with an internet connection, after repeated attempts to train and counsel; an issue surrounding a member's grievance in which timelines [sic] for arbitration had been missed and the Union was required to enter into a settlement with a member; an issue

3

> regarding DeVaughn's failure to timely schedule negotiations
> at one of her facilities; and her failure to run Executive Board
> elections in accordance with established guidelines.  I did not
> think that DeVaughn was a salvageable employee
> considering the severe nature of her failures and the
> repeated nature of many issues.

(*Id.* at ¶ 16.)

## B.     Procedural Background

On May 23, 2013, DeVaughn, *pro se*, filed a Complaint alleging, *inter alias*, race and age-based discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII") and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq*. ("ADEA").[2]  The Complaint was accompanied by a copy of an Equal Employment Opportunity Commission ("EEOC") charge alleging discrimination on the basis of her age and race.  (Doc. No. 1-5.)  In April 2014, Defendant filed a motion for summary judgment.  (Doc. No. 41.)  In May 2014, Plaintiff filed her opposition to the motion for summary judgment, which was accompanied by four declarations by Plaintiff. (Doc. No. 44.)   In June 2014, Plaintiff filed her amended opposition to the motion, which was accompanied by the same declarations, as well as various unauthenticated exhibits. (Doc. No. 45.)   Thereafter, Defendant filed it's reply in support of its motion for summary judgment (doc. no. 46), as well as a motion to strike Plaintiff's opposition (doc. no. 47.)

---

[2] Plaintiff's Complaint also stated claims for gender-based discrimination, hostile work environment and breach of the collective bargaining agreement between SEIU and its own employees, who belong to a staff union.  (Doc. No. 1.)  In March 2014, this Court granted Defendant's motion for judgment on the pleadings, and dismissed all of Plaintiff's claims other than those alleging discrimination on the basis of age and race. (Doc. No. 36.)

4

## II.  Motion for Summary Judgment

**A.      Standard of Review**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party can meet this burden in two ways:  by presenting sufficient evidence to indicate there is no genuine issue of material fact; or by arguing that the nonmoving party, after adequate time for discovery, fails to show sufficient evidence to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleadings, but must set forth through competent and material evidence of specific facts showing that there is a genuine issue for trial.  See Cox v. Ky. Dep't of Transp., 53 F.3d 146, 149 (6th Cir. 1995).  The trial court has no duty to search the entire case record to establish that it is bereft of a genuine issue of material fact.  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989).  The nonmoving party has an affirmative duty to direct the court's attention to specific evidence upon which it seeks to rely.  Al-Qudhai'een v. Am. W. Airlines, Inc., 267 F. Supp. 2d 841, 845 (S.D. Ohio 2003) (citing In re Morris, 260 F.3d 654, 665 (6th Cir. 2001)).  The lack of such a response by the nonmoving party may result in an automatic grant of summary judgment.  Reeves v. Fox Television Network, 983 F. Supp. 703, 709 (N.D. Ohio 1997).

5

In reviewing summary judgment motions, a court must view all facts and inferences drawn therefrom in a light most favorable to the nonmoving party. *Pachla v. Saunders Sys., Inc.*, 899 F.2d 496, 498 (6th Cir. 1990). However, the Court does not weigh the evidence or make credibility determinations. *Joostberns v. United Parcel Services, Inc.*, 166 F. App'x 783, 787 (6th Cir. 2006). Moreover, the mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). In other words, the court should determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 251.

**B.      Legal Framework**

DeVaughn alleges that Defendant discriminated against her on the basis of her race and age, raising claims under Title VII and the ADEA. A plaintiff who alleges discrimination on the basis of her age or race may establish a *prima facie* case of discrimination by either: (1) presenting direct of evidence intentional discrimination; or (2) providing circumstantial evidence that creates an inference of discrimination. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011) (ADEA); *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004) (Title VII).

Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v.White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (internal quotation marks

6

and citation omitted).  "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination has occurred." *Id*.  Where a plaintiff relies on circumstantial evidence to establish discrimination, courts apply the familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Provenzano*, 663 F.3d at 811; *DiCarlo*, 358 F.3d at 415.  Under that analysis, a plaintiff demonstrates a *prima facie* case of discrimination by establishing by a preponderance of the evidence that: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by someone outside of the protected class, or similarly situated persons outside of the protected class did not suffer similar adverse effects.  *Provenzano, 663 F.3d at 812-13*; *DiCarlo*, 358 F.3d at 415.  Where the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse action.  *Wexler*, 317 F.3d at 574.  If the defendant articulates such a reason, the burden returns to the plaintiff to rebut the proffered reason by demonstrating by a preponderance of the evidence that the reason was pretext designed to mask discrimination.  *Id*; *Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 460 (6th Cir. 2004)*.

## C.    Whether DeVaughn Has Established a *Prima Facie* Case of Discrimination

In this case, Plaintiff points to no direct evidence of discrimination.  During her deposition, she testified that she never overheard any of her coworkers or supervisors at SEIU make any disparaging or derogatory comments about her race or her age.

7

(DeVaughn Dep. at 66:11, 71:24-72:5.)  Nor did anyone tell her that her termination was based on her age or race.  (*Id.* at 66:12-15, 72:6-13.)  Accordingly, in order to prevail in this case, DeVaughn must first satisfy the requirements of a *prima facie* case under the burden-shifting analysis described above.

Defendant concedes that DeVaughn satisfies the first three elements of the *prima facie* case, as: (1) she is African American and was over 40 at the time she was terminated; (2) her termination constitutes an adverse employment action; and (3) at the time of her hiring, she was qualified for the position of administrative organizer.  (Motion for Summary Judgment ("MSJ") at 9, Doc. No. 41.)  SEIU argues, however, that Plaintiff offers no evidence that creates a genuine dispute of material fact with respect to whether: (1) she was replaced by an individual outside of the relevant protected classes; or (2) similarly-situated employees who were outside of the relevant protected classes were treated differently than Plaintiff.

> **1.    Whether SEIU Replaced Plaintiff with an Individual Outside of the Relevant Protected Classes**

During her deposition, Plaintiff testified that SEIU replaced her with a woman named Terri who was Caucasian and younger than 40.  (DeVaughn Dep. at 75:13-17; 77:10-15.)  She conceded, however, that no one had told her that this woman had replaced her; rather, Plaintiff assumed that this is what had occurred:

> Q:    Who told you that Terri is the one that replaced you when you were term --
>
> A:    No one told me.  That was kind of obvious, okay. She was looking to be – she lived in Cuyahoga Heights, and she was working out of Cincinnati. She was driving down to Cincinnati every day.  It

was opened, so she applied, is my understanding.

Q:      That's what I'm asking.  I mean –

A:      It's kind of a logical conclusion, is what I'm saying.

*   *   *

A:      And I said – let me repeat.  It's kind of obvious that
        she was looking for another job.  She was looking
        to come up into the Cleveland area because that's
        where she lived.

*   *   *

Q:      You just don't know.  You're assuming it was Terri?

A:      Yes.  I'm assuming it was Terri.

Q:      All right.  Nobody told you that?

A:      No.

Q:      Fair enough.  All right.  And is Terri a white female?

A:      Yes.

Q:      Under the age of 40 –

A:      Yes.  I do believe she's under the age of 40.

*   *   *

Q:      You just don't know for sure?

A:      I don't know for sure.

([DeVaughn Dep. at 75:13-77:19](#).)

DeVauhgn's assumption regarding her replacement is not sufficient to establish a

genuine issue of material fact regarding whether SEIU replaced her with an individual

outside of the relevant protected classes in this case.  It is well established that a

9

plaintiff's "personal beliefs, conjecture and speculation are insufficient to support" an inference of discrimination.  *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986).  Further, SEIU offers evidence that the majority of DeVaughn's duties were ultimately assigned to Danie Tarrow, an African American woman who was over the age of 40.  (Frank Decl. at ¶ 23(e), Doc. No. 41-2; Declaration of Danie Tarrow ("Tarrow Decl.") at ¶¶ 2-3, Doc. No. 41-6.)  Tarrow transferred from SEIU's healthcare division to the public sector division after DeVaughn's termination, and assumed responsibility for five of the nine facilities to which Plaintiff had been assigned.  (Norris Decl. at ¶ 10; Tarrow Decl. at ¶ 6.)  SEIU concedes that, after DeVaughn's termination, three of her facilities were assigned to Terry Anaszewicz and Peggy Torzweski,  two Caucasian women  over the age of 40 who were already working as administrative organizers for SEIU.  (Norris Decl. at ¶¶ 12-13.)  With respect to Anaszewicz, Norris states that she "was assigned [two of Plaintiff's prior facilities] because it made more geographical sense and [Tarrow] was already assigned to ten (10) worksites."  (*Id.* at ¶ 12.)  Although these two women are outside the protected class of Plaintiff's race, the fact that they assumed some of Plaintiff's duties is not sufficient to establish a dispute of fact regarding whether SEIU replaced DeVaughn with individuals of a different race.  *See, e.g., Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) ("[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.").  Accordingly, Plaintiff has not demonstrated a genuine issue of material fact regarding whether she was replaced by an individual outside of the relevant classes in this case.

10

### 2. Whether SEIU Treated DeVaughn Differently Than Similarly-Situated Employees Who Were Outside of the Relevant Protected Classes

In order to establish a *prima facie* case of discrimination using evidence of disparate treatment, a plaintiff must "prove that all relevant aspects of [her] employment situation were 'nearly identical' to those" of the other employees at issue. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 148 (2000), *as recognized in Carter v. Toyota Tsusho America, Inc.*, 529 F. App'x 601, 608-10 (6th Cir. 2013). Generally, "to be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare [her] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). In this case, in order to establish her *prima facie* case, DeVaughn must show that SEIU treated her differently than employees who were similarly situated to her, and who were younger than 40 and not African American.

#### a. Race

Plaintiff does not identify any other SEIU employees who were accused of the same misconduct as Plaintiff and who were retained by Defendant. In her EEOC charge, Plaintiff asserted that SEIU had "a history of discharging African American employees from employment, while retaining the Caucasian employees who had the same/similar issues as the discharged African American employees; Mike Ruff and [Shawn Brown] are two African American employees that were recently discharged from employment." (Doc.

11

No. 1-5.)  During her deposition, Plaintiff testified that she had "anecdotal" evidence that African American employees were treated differently than other employees, but she declined to discuss it in detail:

> Q:      [W]hat's the basis for your belief that SEIU has a history of discharging African American employees while retaining Caucasian employees who had the same or similar issues?
>
> A:      Just discussions that I've overheard, and I think that was one of the questions I asked in discovery.
>
> Q:      Do you have any evidence that SEIU, in fact, has discharged African American employees from employment and treated Caucasian employees more favorably for the same or similar issues?
>
> A:      Again, that question is what I asked in discovery, and what I put down in may complaint is the two examples that I know of.
>
> Q:      Are these the only examples that you know of?
>
> A:      No.
>
> Q:      Okay, let's start with the other examples, and then I'll come back to Mike –
>
> A:      Well, I don't have names.
>
> Q:      Okay.  Well, what, generally, do you understand about them?
>
> A:      I think you explained what,  generally, I understand. You said what, generally, I understand.
>
> Q:      Well, I think I asked you what evidence beyond Mike Ruff and Shawn, and you said you heard of others. And I'm just asking what you know about these others?
>
> A:      And I really don't have any information to tell you.

12

\* \* \*

A:      What I'm saying is there's anecdotal information.  I
        cannot be specific with you at this time, and I do
        believe I've answered the question.

\* \* \*

A:      I'm saying I do believe that I have written down some
        anecdotal information.  Where it is?  I don't know.
        I've tried to talk to other employees.  Other
        employees have not been open about that.  You can
        look at – to me, having worked in different
        organizations, you can look at the composition of the
        organization and see that there is something amiss.
        So that's my testimony.

(DeVaughn Dep. at 54:17-59:3.)

Plaintiff's EEOC charge and deposition testimony are insufficient to demonstrate

a genuine issue of material fact regarding whether SEIU treated Plaintiff differently than

similarly situated employees of other races.  DeVaughn identifies two other African

American employees – Ruff and Brown –  whom she believes were terminated by SEIU.

She does not, however, provide any information regarding the details or circumstances

surrounding the termination of Ruff and Brown.  More importantly, she fails to identify any

non-African American employees who engaged in the same conduct as Ruff and Brown –

conduct she does not identify – who were retained despite this conduct.[3]  Nor does she

identify any non-African American employees who were accused by SEIU of engaging in

the same misconduct as Plaintiff and who were not terminated.

---

[3] During her deposition, Plaintiff testified that she believed that Brown had been
terminated due to issues with his mileage.  (DeVaughn Dep. at 64:14-20.)  She
conceded, however, that this was an assumption based on a conversation she
overheard between Brown and a supervisor in another office.  (Id. at 64: 21-65:2.)

13

In her opposition to the motion for summary judgment, Plaintiff contends that all 11 senior staff members of SEIU are Caucasian, and asserts that "[w]hen we see disparities such as this is [*sic*] becomes easier to discriminated [*sic*] and call it something else.  There are no minorities sitting at the table."  (Plaintiff's Opposition ("Pl. Opp.") at 7, Doc. No. 45.)  In addition to lacking any authenticating information verifying the accuracy of the data, Plaintiff's assertion is not sufficient to create a genuine issue of material fact regarding whether SEIU treated similarly situated non-African American employees differently than it treated her.  The information set forth in Plaintiff's opposition has no bearing at all on the issue of whether SEIU treated DeVaughn differently than other employees who were not African American.  Plaintiff contends that she was *terminated* on the basis of her race, not that she was denied a senior staff position at SEIU.  Further, Plaintiff fails to explain how – or if even – she was similarly situated to the Caucasian employees on the senior staff.  For example, she does not assert that the Caucasian employees were retained despite the same misconduct identified by SEIU as the basis for Plaintiff's termination.  The fact – if true – that SEIU's senior staff consists entirely of non-minorities is not sufficient to demonstrate that SEIU treated Plaintiff differently than similarly-situated non-African American employees when it terminated her.  Accordingly, Plaintiff has not adduced any evidence that creates a genuine dispute of fact regarding whether SEIU treated Plaintiff differently than similarly situated employees of other races.

### b.    Age

Similarly, Plaintiff offers no evidence that SEIU treated her differently than other similarly-situated employees who were younger than 40.  During her deposition, she testified that her union representative told her that other SEIU employees had issues with

14

reporting mileage in May 2012, but were not discharged.  (DeVaughn Dep. at 51:25-52:4.)  Devuaghn conceded, however, that she had just assumed that these employees were younger than she was:

> A:  [M]y union representative told me that she had a talk with [SEIU Director Human Resources Sara Frank] and she said that there were other people that had problems with their mileage, particularly in, and I think the month was May.  And I drew the assumption, since they were younger than me, that they were young employees.  That's an accurate description of it.
>
> Q:  Who mentioned that they were younger than you?
>
> A:  I just said I assumed that they were younger than me.
>
> Q:  And you assumed that based on what?
>
> A:  Based on my age.

(*Id.* at 51:25-52:13.)  Plaintiff's conclusory assertion that unidentified younger employees were not terminated for issues with reporting their mileage is not sufficient to demonstrate a genuine issue of material fact with respect to whether SEIU treated Plaintiff differently than similarly-situated employees who were not yet 40 years old.  *See Chappell*, 803 F.2d at 268.

DeVaughn has not adduced any evidence that creates a genuine issue of material fact with respect to whether SEIU: (1) replaced her with an individual who was not a member of the relevant protected classes; or (2) treated Plaintiff differently than it treated similarly-situated employees who were not members of the protected classes. Accordingly, DeVaughn has failed to establish a genuine issue of material fact with respect to the final element of the *prima facie* case in this matter, and Defendant is

entitled to summary judgment in this case.

**D.     Whether SEIU Has Met Its Burden of Production By Putting Forth Legitimate Nondiscriminatory Reasons for Terminating DeVaughn, and Whether Those Reasons are Pretext for Age or Race-Based Discrimination**

Even if Plaintiff has established a genuine issue of material fact with respect to the *prima facie* case of employment discrimination, SEIU is entitled to summary judgment in this matter because Plaintiff has not adduced evidence sufficient to demonstrate that SEUI's proffered reasons for terminating her are pretext for discrimination.  Defendant identifies several bases for terminating DeVaughn: (1) her repeated failure to accurately report her mileage and update her shared calendar; (2) her failure to ensure that a union member's grievance from a disciplinary suspension was appealed in a timely manner, resulting in SEIU paying the union member a settlement; (3) her errors in conducting an executive board election; and (4) her failure to schedule negotiations with one facility in a timely manner, resulting in a threatened cancellation of the collective bargaining agreement.  (Norris Decl. at ¶¶ 16-26; Frank Decl. at ¶ 20.)  Although DeVaughn responds to each of these proffered reasons, she does so via self-serving, conclusory declarations that generally deny SEUI's version of events or merely question Defendant's motives without pointing to specific evidence to demonstrate that SEIU's proffered reasons for terminating her are pretext for discrimination.  These unsupported, conclusory assertions are insufficient to create the issue of material fact necessary to survive summary judgment in this case.  *See Celotex*, 477 U.S at 322 ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party *who fails to make a showing sufficient to*

16

*establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial*.") (emphasis added); *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir. 1990) ("[M]ere conclusory allegations are not sufficient to withstand a motion for summary judgment. . . . The fact that [the plaintiff] disagrees with [the defendant's] assessment of his performance . . . does not render [the defendant's] reasons pretextual.")

There is no dispute that these explanations satisfy Defendant's burden of articulating legitimate nondiscriminatory reasons for Plaintiff's discharge.  Accordingly, the burden shifts to DeVaughn to demonstrate by a preponderance of the evidence that SEIU's proffered reasons for pretext for discrimination. At the summary judgment stage, a plaintiff shows pretext by offering evidence "either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis and internal quotation marks omitted), *abrogated on other grounds by* *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167 (2009), *as recognized in* *Geiger v. Tower Automotive*, 579 F.3d 614, 621 (6th Cir. 2009).

SEIU identifies four bases for its decision to terminate DeVaughn.  The first is DeVaugn's repeated failure to properly input her mileage and update her shared calendar in the VPN.  (Norris Decl. at ¶ 16.)  In her declaration, Frank states that, when she conducted DeVaughn's orientation in August 2008, she explained "how [DeVaughn's] mileage should be recorded and demonstrated the electronic system for her." (Frank

17

Decl. at ¶ 12.)  Frank also states that, during DeVaughn's tenure with SEIU, "several training opportunities were held in an attempt to better the understanding of staff in several areas, including information technology."  (*Id*. at ¶ 13.)  SEIU Controller Connie Figgins avers that DeVaughn had multiple problems with accurately recording her mileage:

> I know that DeVaughn contacted me on a few occasions
> regarding issues she had with her mileage.  She had
> submitted her entries late or did her mileage incorrectly.  I
> replied to her emails and phone calls.  In December of 2011,
> I explained what the deadlines were for timely submission
> and asked her to call me so that I could walk her through the
> process.  As of May 2012, I again explained the deadlines for
> timely submission of mileage.

(Declaration of Connie Figgins ("Figgins Decl.") at ¶ 5, Doc. No. 41-1.)  Norris avers that he showed DeVaughn on multiple occasions "how to enter mileage and use the shared calendar."  (Norris. Decl. at ¶ 20.)

Copies of e-mail messages submitted in support of Defendants' declarations demonstrate that SEUI officers communicated with DeVaughn multiple times regarding issues with her mileage and her shared calendar.  In December 2011, DeVaughn contacted Figgins to inquire about the whereabouts of her mileage reimbursement for October and November 2011.  (Figgins Decl. at Ex. B.)  Figgins responded by explaining that DeVaughn had not inputted the mileage into the system before the cutoff required by SEIU's mileage policy.  (*Id*.)  Figgins told DeVaughn that she would "walk [her] thr[ough] the process."  (*Id*.)  Also in December 2011, Norris contacted DeVaughn to inquire about her whereabouts on two different dates so that he could approve her mileage, noting that she had not updated her calendar to reflect where she had been.  (Norris Decl. at Ex. C.)

18

In April 2012, Norris contacted DeVaughn about three dates for which she had input multiple mileage entries.  (Norris Decl. at Ex. C.)  He asked DeVaughn to review the mileage she had input into the system and tell him which was correct.  (*Id*.)  He also asked her whether "there [was] some part of the process that is creating an issue or can you please let me know what happened to create the additional entry for that date?"  (*Id*.)  DeVaughn explained that she had accidentally input two entries for the dates and did not know how to erase them.  (*Id*.)  In May 2012, DeVaughn again contacted Figgins about a missing mileage reimbursement, and Figgins explained that DeVaughn had not reported her mileage before the required date.  (Figgins Decl. at Ex. B.)  Figgins again explained the mileage policy, and told DeVaughn that she would receive her mileage reimbursement for that period of time during the next run of reimbursement checks.  (*Id*.)  Also in May 2012, Norris contacted DeVaughn and told her that, although he had access to her shared calendar, "there aren't any appointments or anything showing up on any of the days."  (Norris. Decl. at Ex. C.)  He asked her to fill her calendar in as soon as possible.  (*Id*.)

DeVaughn responds to Defendant's contention regarding her reporting of her mileage and her calender by generally asserting that she was not initially made aware of the calendar requirement and that, to the extent that she did err in failing to comply with SEIU's policies regarding the mileage and calender, those errors did not merit termination.  Specifically, in her various declarations in support of her opposition to the motion for summary judgment, Plaintiff avers that: (1) she was not initially informed either that she was required to maintain a shared calendar or that she needed to update any changes to it by logging onto the VPN and uploading the changes; (2) although Frank

19

showed her "twice very quickly how to log on to the system, that was the extent of any training on this system," and DeVaughn was never trained on the use of the VPN; and (3) she made errors in reporting her mileage "when I was working two assignments working on Issue 2," but "the penalty for not getting your mileage in on time is not getting paid for the mileage not termination, for others at least."  (Doc. Nos. 45-5 at ¶ 12, 45-6 at unnumbered pages 3-4, ¶ 6.)

Plaintiff fails to establish that SEIU's proffered reason for her termination based on her difficulties with the calendar and mileage are pretext for discrimination.  Although Plaintiff contends that she did not know that she was required to use and update a shared calendar, the e-mail messages submitted by SEIU demonstrate that Norris contacted her about her whereabouts in December 2011, and, in May 2012, noted that her shared calendar was blank and asked her to fill it in.  Norris states that DeVaughn "routinely" failed to comply with the calendar and mileage requirements, and the e-mail correspondence supports this statement.  Further, DeVaughn concedes that she made errors inputting her mileage, and the e-mail correspondence bears this out.  DeVaughn does not dispute that she received these e-mail messages.  DeVaughn makes the conclusory assertion that these errors do not merit termination.  This unsupported argument, however, is undermined by Norris's explanation that he relies on the administrative organizers' calendar entries and mileage reports to confirm that the organizers were performing their jobs.  The evidence does not create a genuine issue of material fact with respect to whether this proffered reason for DeVaughn's termination was a pretext for discrimination.

The second reason for DeVaughn's termination offered by SEIU was

DeVaughn's failure to ensure that the grievance of Lupe Martinez, a union member in Wood County, was timely appealed to arbitration.  (Norris Decl. at ¶ 21.)  According to Norris, because SEIU failed to timely appeal Martinez's grievance to arbitration, the arbitrator determined that the grievance was procedurally defective and dismissed the appeal.  (*Id*.)  SEIU entered into a settlement agreement with Martinez, which required Defendant to pay Martinez $753.33. (*Id.* at ¶ 23.)  In support of this basis for terminating DeVaughn, SEIU provides: (1) the job description of an administrative organizer, which includes "mediate and arbitrate resolution of disputed member grievances" in its "key areas of responsibility" (Frank Decl. at Ex. A); and (2) a copy of the arbitrator's decision in the relevant grievance, concluding that SEIU had failed to timely appeal the grievance to arbitration (Norris Decl. at Ex. D.)  In the decision, the arbitrator noted SEIU's position that it had timely requested arbitration via a January 23, 2012 letter from DeVaughn to the employer.  (*Id.* at 14.)  The arbitrator ultimately concluded that SEIU could not demonstrate that the employer had actually received the letter and, even if it had, the letter was untimely by four days.  (*id.* at 23.)

DeVaughn responds to SEIU's contention regarding the untimely appeal by contending that: (1) she never received a copy of her job description; (2) the "filing of grievances is the providence [*sic*] of the delegates"; and (3) the arbitrator did not deny the appeal because it was untimely, but, rather, because the union member had improperly filed two separate grievances.  (Doc. No. 45-6 at ¶¶ 9-10; DeVaughn Dep. at 106:6-115:9.)  DeVaughn's evidence of pretext is not "sufficient . . . for a jury to return a verdict" in her favor.  *Anderson*, 477 U.S. at 249; *see also Manzer v. Diamond Shamrock Chems.*

21

_Co._, 29 F.3d 1078, 1084 (6th Cir. 1994) (noting that, to succeed in demonstrating pretext by showing that the employer's stated reason did not actually motivate the adverse action, an employee must "indict the credibility of [the] employer's explanation by showing circumstances which tend to prove that an illegal motivation was _more_ likely than that offered by the defendant"), _overruled on other grounds as recognized in_ Geiger v. Tower Automotive, 579 F.3d 614, 621 (6th Cir. 2009).  Although DeVaughn contends that it was not her responsibility to timely appeal the grievance to arbitration, that contention is undermined not only by the job description of an administrative organizer, but also by the fact that DeVaughn does not dispute that, in January 2012, she authored the untimely letter requesting arbitration.  Plaintiff's assertions and evidence do not create a genuine issue of material fact with respect to whether this proffered reason for DeVaughn's termination was a pretext for discrimination.

The third reason identified by SEIU as a basis for DeVaughn's termination is that she made multiple mistakes in conducting executive board elections at two of her facilities,  the Wood County Department of Health and Tri-C.  In her declaration, SEIU's Special Assistant to the President Mary Jo Ivan avers that, with respect to Wood County, Plaintiff: (1) counted an invalid ballot; (2) posted a notice of election that violated federal law by endorsing a candidate; and (3) failed to return a complete packet to Ivan after the election, as required by federal law.  (Declaration of Mary Jo Ivan ("Ivan Decl.") at ¶ 5, Doc. No. 41-3.)  With respect to Tri-C, DeVaughn asked Ivan "if she could add an additional vote cite to the Tri-C voting without giving members the proper amount of notice." (_Id._ at ¶ 6.)  According to Ivan, DeVaughn did not "fully understand how to run internal union elections after several corrective conversations," and DeVaughn "stands

22

out in [Ivan's] mind for having many more and much more serious issues conducting union elections than most administrative organizers with whom [Ivan has] dealt over the 18 years [she has] conducted internal union election [*sic*] at District 1199."  (*Id.* at ¶ 6, 7.)

In support of this basis for terminating DeVaughn, SEIU provides: (1) a copy of an election notice for the executive board of the Wood County facility, which endorses a candidate, and which bears a post-it note reading "Invalid re-run ordered," dated February 2, 2012 and initialed by Ivan (Ivan Decl. at Ex. C); (2) a January 2012 e-mail from Ivan to Norris in which Ivan asks Norris to call her because "Karen DeVaughn sent in a packet that is wrong and is missing information" (Norris Decl. at Ex. I); (3) a March 2012 e-mail exchange between DeVaughn and Ivan, in which DeVaughn asks whether she can add an additional voting site to the election at Tri-C, and Ivan responds that she cannot because "there has to be 15 days notification (Ivan Decl. at Ex. D); and (4) a May 2012 e-mail exchange between DeVaughn and a recently-elected member of the SEIU executive board, in which the member asked whether his election had been certified by SEIU and in which DeVaughn responded that, "there was a question raised about the notification to members process and whether the nomination process was done correctly" (Norris Decl. at Ex. I).

In her various declarations in support of her opposition to the motion for summary judgment, Plaintiff contends that "the initial election for Wood County was in fact correct It [*sic*] occurred on [*sic*] December 2011.  But they do not present it to the Court."  (Doc. No. 45-6 at ¶ 10.)  Specifically, DeVaughn contends that she followed the procedure for internal elections at Wood County, and she disputes Ivan's claim that DeVaughn counted an invalid vote at Wood County.  (Doc. No. 45-3 at ¶ 14.)  DeVaughn does not, however,

dispute that she posted the notice endorsing the candidate at Wood County, or that she asked Ivan about adding an additional election site at Tri-C. Her response to the Wood County executive board member-elect's question in her May 2012 e-mail undermines her assertion that she correctly conducted the election in December 2011.  In light of the evidence in support of this reason for her termination, DeVaughn's conclusory assertion that she properly conducted the Wood County election is not sufficient to demonstrate pretext, particularly in light of the fact that she does not dispute that she engaged in some of the conduct identified as a basis for termination.  Accordingly, there is no genuine issue of material fact with respect to whether this proffered reason for DeVaughn's termination was a pretext for discrimination.

Finally, SEIU contends that the final reason it terminated DeVaughn was her delay in contacting Tri-C management to schedule negotiations at that facility.  (*Norris Decl. at ¶ 26*.)  According to Norris, DeVaughn did not contact Tri-C until April 2012, which "resulted in the threatened cancellation of the" collective bargaining agreement.  (*Id*.)  In support of this reason, SEIU submits an April 2012 e-mail exchange between DeVaughn and Gary Berkowitz, the director of human resources at Tri-C.  (*Id*. at Ex. J.)  The correspondence reflects that, on April 27, 2012, DeVaughn contacted Berkowitz and inquired about commencing contract talks.  (*Id*.)  In the e-mail, DeVaughn describes the collective bargaining agreement between SEIU and Tri-C as "on a year extension which ends on June 30th 2012."  (*Id*.)  On April 30, 2012, Berkowitz responded:

> [T]he College's extension agreement with [SEIU] was extended only "until July 2011 [and only] for successive ten (10) day periods thereafter," rather than for one year as your email states. I have waited patiently since November to receive some sort of notification concerning your interest to

> start negotiations; but to suggest we start in May might be a bit presumptive.  The College will first need to formulate it's [*sic*] negotiating team and from there prepare proposals before we're ready to sit at the table with the Union.  I anticipate we should be able to start negotiations toward the end of May, but can't guarantee it.  When ready, I will contact you with dates to see how these fit with your schedule.

(*Id*.)

In response to this basis for her termination, DeVaughn states that Al Bacon, an officer of SEIU, was "doing the negotiations for . . . Tri-C," and that Bacon "did not see fit to make arrangements to let the agency know that as soon as he finish [*sic*] with the Full Time workers[4] he want [*sic*] to start on the Part time workers so that makes me responsible." (Doc. No. 45-6 at ¶ 10.)  She also notes that she was not hired by SEIU until after the collective bargaining agreement expired.  (*Id*.)[5]  Although arguably a closer question than the other proffered reasons in this case, Plaintiff's evidence and assertions are, again, insufficient to demonstrate that this reason for her termination is pretext for discrimination.  Her claim that it was someone else's responsibility to schedule negotiations is simply not  "sufficient . . . for a jury to return a verdict" in her favor, *Anderson*, 477 U.S. at 249, particularly in light of the fact that DeVaughn does not dispute that she contacted Tri-C in April 2012 for the purpose of scheduling negotiations, and her letter to Berkowitz does not reflect that she had done so at the direction or on behalf of

---

[4] The record reflects that SEIU represented two different groups of employees at Tri-C: full time workers, and part time workers.  (Norris Decl. at ¶ 7.)

[5] Plaintiff also asserts that, in its Answer to her Amended Complaint, SEIU admitted that DeVaughn was "not the one who messed this up." (Doc. No. 45-6 at ¶ 10.)  Review of the Answer to the Amended Complaint reveals that SEIU admitted that "Al Bacon represented Defendant in contract negotiations for the full time employees at Tri-C." (Doc. No. 9.)

any other person, including Bacon.

Plaintiff has failed to carry her burden of demonstrating that SEIU's stated reasons for terminating her are pretext for discrimination.  Her self-serving declarations are conclusory and insufficient to raise a genuine issue of material fact on this issue.  *See Celotex*, 477 U.S. at 322; *McDonald*, 898 F.2d at 1162.   Accordingly, even if she had established a genuine issue of material fact with respect to the *prima facie* case in this matter, SEIU would still be entitled to summary judgment on Plaintiff's  claims.

### III.  Motion to Strike

In it's motion to strike, SEIU argues that this Court should strike Plaintiff's amended response in opposition to its motion for summary judgment on the basis that, *inter alias*, it is supported by unauthenticated exhibits and at least one unsigned declaration.  (Doc. No. 47.)  Defendant is likely correct in noting that, because DeVaughn did not authenticate any of her exhibits, and failed to sign her declaration in response to Frank's declaration, this evidence is not properly before the Court.  However, for the reasons set forth in the section pertaining to summary judgment, even if this Court were to consider DeVaughn's evidence, SEIU would still be entitled to summary judgment in this matter.  Accordingly, Defendant's motion to strike is DENIED as moot.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is

GRANTED and the motion to strike is DENIED as moot.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: June 16, 2014

27